**LANDMARK WEST! Plaintiff,**

**v.**

**The UNITED STATES POSTAL SERVICE, Millennium Partners, Inc., and Lincoln Metrocenter Partners, L.P., Defendants.**

No. 92 Civ. 9225 (KC).

United States District Court, S.D. New York.

Dec. 29, 1993.

Edward C. Wallace, Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for plaintiff.

Bernard W. Bell, Asst. U.S. Atty., Stephen J. Ritchin, Berle Kass & Case, New York City, for defendants.

## OPINION AND ORDER

CONBOY, District Judge.

In this action, a neighborhood group called Landmark West! is seeking to halt the construction of a skyscraper due to an alleged failure to comply with the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321–4347. The defendants in the action are the developers currently building the skyscraper—Millennium Partners, Inc. and Lincoln Metrocenter Partners, L.P. (collectively, "LMP")—and one of the prospective tenants—the United States Postal Ser-

vice (the "USPS"). On July 19, 1993, this Court held a hearing on whether a preliminary injunction should issue, but reserved decision on the matter. The action is now before the Court on the defendants' respective motions for judgment on the pleadings or, alternatively, summary judgment, and on Landmark West!'s cross-motion for summary judgment.[1]

## BACKGROUND

The following discussion is based upon the administrative record submitted by the USPS, except as noted.

### A. The Project

LMP is currently constructing a forty-six story[2] "mixed use" building (the "Project") on the city block bounded by Broadway, Columbus Avenue, West 67th Street and West 68th Street (the "Site") in the Lincoln Center area of Manhattan. The Project, which is slated to rise approximately 545 feet above street level, was designed to accommodate a post office, a health club, 10 movie theaters and various other commercial establishments on the lower floors, and approximately 368 residential units in the upper tower. It is estimated that the cost of developing the Project will be over $250 million.[3]

### B. USPS Participation in the Project

Until mid-summer 1992, the USPS operated the Ansonia Station post office out of a three-story building that formerly stood at 1990 Broadway on the western portion of the Site. The old Ansonia Station occupied two stories and part of the basement of this building, and included seven loading docks on West 68th Street. The USPS leased this space, totalling roughly 57,000 square feet, under a lease that provided the USPS with a very favorable rate of rent: approximately $2 per square foot (plus a prescribed share of the applicable property taxes) in an area of the city in which retail space typically was rented out at up to $200 per square foot. Under this lease, the USPS had the option to extend the lease, and remain in the old Ansonia Station building, through the year 2006.

On June 3, 1992, the USPS and LMP executed an agreement (the "Agreement")[4] in which the USPS essentially swapped, in conjunction with certain payments, its existing lease for a new postal facility in the Project. More precisely, the USPS agreed to vacate the old Ansonia Station building in exchange for a promissory note carrying an initial principal value of $15 million.[5] This note is secured by a 12.948% limited partner-

---

1. Landmark West argues that if this Court deems certain issues to be material, then summary judgment in favor of the defendants is not appropriate because "genuine material issues do exist which cannot be resolved from the record." Plaintiff's Statement and Counter–Statement Pursuant to Rule 3(g), at 3–4; *accord* Plaintiff's Memorandum of Law in Support of Its Cross–Motion for Summary Judgment, and in Opposition to Defendants' Motion to Dismiss, or Alternatively, for Summary Judgment, at 33–35 [*hereinafter* "Plaintiff's Memorandum"]. This argument reflects a fundamental misunderstanding of the standard for summary judgment. The Federal Rules of Civil Procedure expressly state that Landmark West! "may not rest upon ... mere allegations or denials," but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Instead of now arguing that a trial is necessary so that it, for example, can "cross-examine" a USPS official, *see* Plaintiff's Statement and Counter–Statement Pursuant to Rule 3(g) ¶ 19, Landmark West! should have moved for discovery earlier.

2. Apparently, no floor will be referred to as the thirteenth floor. As a result, the top floor will be referred to as the forty-seventh floor.

3. *See* Jeffries Aff. ¶ 16.

4. The following five documents comprise the Agreement: the Condominium Unit Contract of Sale (the "Contract of Sale"), the Amended and Restated Lease (the "Amended Lease"), the Note, the Pledge and Assignment of Partnership Interest (the "Pledge"), and the Amendment of Pledge and Assignment of Partnership Interest (the "Pledge Amendment"). The Pledge Amendment was executed on May 12, 1993. The Note, the Pledge, and the Pledge Amendment are contracts between the USPS and an affiliate of LMP. *See infra* note 6.

5. *See* Administrative Record [*hereinafter* "A.R."] 83, at 497 (Note ¶ 2). This note carries an annual interest rate of 15 percent during its twenty-five year term to maturity. *See id.* at 497–98 (Note §§ 1(b) and 1(f)). Interest payments are due monthly, but are capitalized for the first thirty months and paid out thereafter. *See id.* (Note §§ 1(d) and 4).

ship interest in Lincoln Metrocenter Partners, L.P.[6] In connection with this arrangement, the USPS has negative control over changes in the Lincoln Metrocenter Partners, L.P. partnership agreement,[7] and the USPS will directly receive all distributions related to this limited partnership interest.[8]

Further pursuant to the Agreement, the USPS simultaneously purchased a condominium interest in the Project for $9.8 million, which was paid mostly in cash.[9] This condominium interest gives the USPS ownership of a new 45,000–square-foot postal facility (the "New Facility") to be located on the ground and cellar floors of the Project, with five loading docks on West 68th Street for the USPS's exclusive use. The condominium interest also gives the USPS a percentage undivided interest in certain common elements of the Project, including the land on which it is being built.[10] This percentage is the basis for determining, *inter alia*, the USPS's voting power in the condominium.[11]

Under the Agreement, the USPS has limited power to change the design and construction of the New Facility, and has negative control over other aspects of the Project only to the extent they may affect the use and operation of the New Facility.[12]

## C. Evolution of the Agreement and USPS Environmental Assessment of the Proposals

Some time prior to January 1991, General Atlantic Realty, a developer that was at the time contract vendee of the Site, proposed a transaction in which the USPS would capitalize on its leasehold interest in the old Ansonia Station building and relocate to a condominium space in a proposed new development on the Site.[13] The USPS attributed its interest in the proposal to its concern about its ability to relocate, at an economical price, within the Ansonia Station delivery area when its lease expired in 2006.[14] In this context, the proposal presented the USPS with an opportunity to exercise to its financial advantage the leverage provided by its existing below-market lease.[15] In addition, the USPS recognized that the old Ansonia Station was inaccessible to the handicapped.[16]

Under the initial proposal, the USPS would have purchased the old Ansonia Station building for $9.9 million in cash (and $500,000 in "support cost"), and the developer would have obtained an option to build a commercial development (including a replace-

---

6. The maker of the Note was Opera Development Associates ("Opera"), a limited partner of Lincoln Metrocenter Partners, L.P. *See id.* at 497 and 503 (Note ¶ 2 and Pledge ¶¶ 2, 3(a)). Opera is affiliated with LMP through Christopher M. Jeffries, who is managing general partner of Lincoln Metrocenter Partners, L.P.; president and principal shareholder of Millennium Partners, Inc.; and president of two entities—LAC, Inc. and Lincoln Square Development Corp.—empowered to act on behalf of Opera. *See* Jeffries Aff. ¶ 1; A.R. 83, at 517 (signature lines). Opera's sole function is to hold a limited partnership interest in Lincoln Metrocenter Partners, L.P. *See* A.R. 83, at 509 (Pledge ¶¶ 4(*o*)–(q)).
 The Note is secured by a pledge of Opera's entire limited partnership interest, *see id.* at 503 and 505, and Opera is obliged to make prepayments of the Note's principal equal to the amount of any partnership distributions that Opera receives, *see id.* at 498 (Note § 1(e)). Originally, the Note was secured by a 9.2492% limited partnership interest, and the USPS had an option to increase its security to a 16.5813% limited partnership interest in exchange for $2.75 million. *See id.* at 3 and 13 (Pledge ¶¶ 3(a), 18). Because exercise of this option would have increased Opera's percentage interest· in LMP, it also would have increased the amount of the distributions and thus accelerated the Note's

amortization. However, on May 12, 1993, the USPS relinquished this option in exchange for an increase of its security to a 12.948% limited partnership interest. *See* Supplemental Administrative Record [*hereinafter* "S.A.R."], at 91 and 94 (Amended Pledge ¶¶ 3, 4 and Exh. A); Jeffries Supp. Aff. ¶ 3.

7. *See infra* note 54.

8. *See* A.R. 83, at 518 (Pledge, Exh. A).

9. Of this amount, $9,546,053 was paid to LMP in cash on June 3, 1992. *See* A.R. 84, at 521.

10. *See* A.R. 83, at 479 (Contract of Sale, Exh. G).

11. *See id.*, at 478 (Contract of Sale, Exh. G).

12. *See infra* notes 52–53 and accompanying text.

13. *See* A.R. 4, at 19.

14. *See* A.R. 8, at 42.

15. *See id.*

16. *See* A.R. 18, at 129.

ment postal facility) on the eastern portion of the Site.[17] In addition, the USPS would have been able to trade the old Ansonia Station building for a condominium interest in the replacement facility. After the relocation of Ansonia Station Post Office from the old building to the replacement facility, the old building would have been demolished and "replaced by a new commercial retail development and [the USPS] would be guaranteed twenty percent of the income generated by the complex." [18] In February 1991, the USPS Capital Investment Committee approved funding for this proposal, subject to a finding under NEPA of no significant impact on the human environment. (Such a finding is referred to as a "FONSI," which is short for a "finding of no significant impact.") In July 1991, the USPS published an environmental assessment of the proposed purchase of the old building and relocation of the post office to the Project,[19] and issued a FONSI on the basis of this assessment. However, this proposal was not implemented.

Instead, the USPS and LMP negotiated a modified proposal which was the basis for the eventual Agreement between the USPS and LMP. In late April 1992, the USPS disseminated a Notice of Intent to prepare an amended environmental assessment of the USPS's proposed participation in the Project.[20] In May 1992, the USPS finalized the amended environmental assessment, which served as the basis for the FONSI that is being challenged in the present action.

## D. Local Zoning Approval

Under local zoning regulations, a special permit is required in order to build off-street loading docks in the Lincoln Square zoning district. See Landmark West v. Rinaldi, No. 25201/92, slip op. at 2 (N.Y.Sup.Ct. Feb. 19, 1993). Such a permit may be issued only after public hearings on the impact of the proposed building have been held, and after the proposal has been considered by the Community Board, the Borough President, and the City Planning Commission. See id. The building plans that LMP initially filed with the New York City Department of Buildings indicated that the Project would include the post office, including the USPS's loading docks on West 68th Street.[21] For reasons unrelated to the inclusion of the loading docks, these plans were disapproved.[22] By May 18, 1992, LMP had submitted amended plans that did not indicate the presence of the post office or the loading docks,[23] and thereafter the Department of Buildings issued a building permit allowing for construction of the Project "as of

17. See A.R. 4, at 19; A.R. 7, at 39; A.R. 8, at 42–43; A.R. 18, at 83. This proposal was incorporated into a letter of intent dated April 4, 1991 between W.S. Triangle, Inc. and the USPS. See A.R. 11. W.S. Triangle was a predecessor of LMP that was controlled by Christopher M. Jeffries, who is currently the managing general partner of Lincoln Metrocenter Partners, L.P. and the President and principal shareholder of Millennium Partners. See Jeffries Aff. ¶¶ 1–2.

18. A.R. 8, at 43.

19. See A.R. 18.

20. This notice described the proposed action as:

the relocation of the Ansonia Station Post Office from a 56,726 square foot facility located at 1990 Broadway ... to a 45,000 square foot facility to be located on the same block as the existing facility. This new facility would have its pedestrian entrance on Columbus Avenue near the corner of West 68th Street. The loading bays for the facility would remain in their existing location on West 68th Street. The new facility would be located on the lower floors of a private development which would be constructed on the block after demolition of all existing buildings. The private project is separate from the Postal Service action and could proceed without the cooperation of the Postal Service.

The Postal Service plans to purchase the new facility from the private developer as a condominium. During the construction period of the private project, the Postal Service would temporarily relocate the Ansonia Station to a site within a two block radius of the existing facility.

A.R. 47, 48, and 63.

21. See A.R. 27, at 160.

22. See id. While the loading docks were initially cited as a reason for disapproval of the plans, the citation of the loading docks was withdrawn on the same day the disapproval was issued, apparently on the order of the Commissioner of the Department of Buildings. See id.

23. See A.R. 107, at 613.

right," [24] thereby allowing the Project to proceed without public hearings. *See id.*, slip op. at 3.[25]

On June 3, 1992 and again on June 29, 1992, the USPS notified the Department of Buildings that it intended to operate five loading docks at the New Facility. The USPS asserted that local laws requiring a special permit do not apply to federal entities such as the USPS, but purported to stop short of formally invoking superior sovereignty.[26] The Commissioner of the Department of Buildings subsequently took the position that unless the USPS "request[s] that they be exempt from local provisions ... they will be required to get a special permit for the construction of the loading docks." [27]

## DISCUSSION

### A. Justiciability

LMP argues, as a threshold matter, that this Court may not hear this action because the action is non-justiciable.[28] Specifically, LMP argues that the action is moot because this Court lacks jurisdiction to enjoin LMP, and although this Court may enjoin the USPS, the USPS cannot take any action to halt construction of the Project. The argument that this Court may not enjoin LMP begs the question of whether the USPS's participation in the Project—allegedly as a

source of funds and as a partner—is sufficient to subject the entire Project to NEPA. In the words of Judge J. Skelly Wright, " '[f]ederal funding has long been recognized as an appropriate basis to enforce NEPA requirements on non-federal parties." *Foundation on Economic Trends v. Heckler*, 756 F.2d 143, 155 (D.C.Cir.1985); *accord Biderman v. Morton*, 497 F.2d 1141, 1147 (2d Cir.1974); *Proetta v. Dent*, 484 F.2d 1146, 1148 (2d Cir.1973); *cf. Ivanhoe Irrigation Dist. v. McCracken*, 357 U.S. 275, 295, 78 S.Ct. 1174, 1185, 2 L.Ed.2d 1313 (1958) ("Also beyond challenge is the power of the Federal Government to impose reasonable conditions on the use of federal funds, federal property, and federal privileges."). Similarly, it is well established that a non-federal party may be enjoined if it has entered into a partnership or joint venture with a federal agency. *See Dalsis v. Hills*, 424 F.Supp. 784 (W.D.N.Y.1976).

■ Moreover, the USPS has not yet completed the actions for which it prepared an environmental assessment—particularly, relocating to the New Facility. There is no question that the USPS, as a federal agency, may be enjoined from completing these actions if its environmental review is found to be deficient. Therefore, LMP's argument of nonjusticiability is without merit.[29]

"[w]hether the USPS will make a claim of 'superior sovereignty' is speculative at this time and the effectiveness of such claim can be considered in a future proceeding when and if [LMP] submits amended plans." *Id.*, slip op. at 6–7. In an alternate holding, the state court ruled that Landmark West! had failed to exhaust its administrative remedies. *See id.* at 7.

26. *See* A.R. 86, at 524; A.R. 99, at 547.

27. A.R. 101, at 549; *accord* A.R. 104, at 555.

28. In its answer to the complaint, the USPS also raised the defense of non-justiciability. However, because the USPS has not briefed this defense, it is deemed waived with respect to the USPS.

29. In its answer to the complaint, the USPS challenged Landmark West!'s standing to bring this action. However, the USPS failed to address this defense in its briefs, so it is deemed to be waived.

---

24. A project can be built "as of right" if it "complies with all applicable laws and provisions." *Id.* No special permit is required for an "as of right" project under a presumption that "the controls established in the Building Code and Zoning Resolution are sufficient to result in buildings that are well-planned and environmentally sound and therefor [sic] need no discretionary review." *Id.*

25. Landmark West! challenged the issuance of this permit in state court. Landmark West! argued that allowing the building to proceed "as of right" on the basis of "deceptive" plans that did not include the loading docks, while knowing that the USPS would later invoke superior sovereignty to allow the loading docks to be built without a special permit, would result in the avoidance of required public hearings. *See Landmark West*, slip op. at 3–4. The state court observed that "no threat to the neighborhood is presented from street loading docks which at this time can not [sic] be built," and ruled that Landmark West!'s challenge was premature because

## B. Laches

 The defendants contend that Landmark West!'s challenge to the FONSI is barred by the doctrine of laches, noting that Landmark West! did not bring this action until December 22, 1992, over six months after groundbreaking on the Project occurred. A claim is barred by laches upon a showing "that there has been 'a delay in asserting a right or claim, that the delay was not excusable and that there was undue prejudice to the party against whom the claim is asserted.'" *East 63rd Street Ass'n v. Coleman*, 414 F.Supp. 1318, 1330 (S.D.N.Y.1976) (quoting *Ecology Ctr., Inc. v. Coleman*, 515 F.2d 860, 867 (5th Cir.1975)). "[L]aches is a doctrine that is only rarely invoked in environmental cases, on account of the strong public interest in effecting compliance with NEPA...." *City of Rochester v. USPS*, 541 F.2d 967, 977 (2d Cir.1976) (citations omitted).

While Landmark West! did not bring this action until well after receiving notice of the FONSI, this Court finds this delay to be excusable for two reasons. First, the USPS indicated to Landmark West! that its decision to relocate to the Project—the only USPS involvement in the Project that Landmark West! was aware of at the time—was subject to reconsideration. As late as October 6, 1992, the Postmaster General apprised Landmark West! that "it is not too late for us to give ... serious consideration" to any alternative locations for the Ansonia Station post office that Landmark West! could suggest, and that the USPS itself would "make a new inquiry into the availability of alternative location(s)." [30]

Second, and more significant, the USPS obscured the extent of its participation in the Project even after the issuance of the FON-SI. As all parties to this action appear to acknowledge, the merits of Landmark West!'s challenge to the FONSI turn primarily upon the nature and degree of the USPS's involvement in the Project, including the relationship between the USPS and LMP. Yet the details of the USPS's participation in the Project were a well-kept secret, in spite of Landmark West!'s attempt to learn more about them. On May 6, 1992, Landmark West! requested that the USPS indicate the basis for its claim, contained in the notice of intent to prepare an amended environmental assessment, that the "private project is separate from the Postal Service action and could proceed without the cooperation of the Postal Service," and also requested details of the USPS's "plans to purchase the new facility." [31] The USPS's responses to these requests on June 25, 1992 were less than forthcoming. In response to the first request, the USPS quoted a passage from the amended environmental assessment stating that LMP intends to "build its project" regardless of the USPS's decision to relocate. [32] In response to the second request, the USPS merely said that it had "entered into a contract to purchase space in the Grand Metropolitan." [33] Neither response provided any indication of the financial arrangements among the USPS, LMP and Opera which have raised the question of whether an otherwise private project had been federalized.

This Court hastens to add that it does not interpret NEPA to impose upon the USPS a requirement that it publicly disclose details of its relationships with non-federal parties that engage in actions with potentially significant environmental impacts. It merely holds that if the USPS chooses to provide grudging answers to public inquiries about

---

30. Simon Aff. Exh. B.

31. A.R. 51, at 213.

32. The USPS quoted the following passage:

The private project within which the Ansonia Station would be located is an as-of-right development under the NYC Zoning Resolution. Plans for the project were filed with the NYC Department of Buildings in February 1992. Occupancy is expected in late 1994 or early 1995. Lincoln Metrocenter Partners L.P. (the developer) together with an affiliate [sic] entity, is the contract vendee of the entire block. The developer intends to build its project whether the USPS remains in its current space or moves to the new facility within the developer's project. This project, known as the Grand Metropolitan at Lincoln Center, would differ in lower floor configuration if the Postal Service did not relocate.
A.R. 98, at 544.

33. *Id.*

these relationships, it cannot be heard to complain that one of the frustrated inquirers has waited too long to bring a claim grounded in the facts that the USPS has concealed.

## C. Alleged NEPA Violations

Landmark West! alleges that the USPS violated NEPA by failing to undertake an environmental assessment of the entire Project. Landmark West! contends that the USPS was obliged to do so because the USPS's participation in the Project "federalized" the entire Project for NEPA purposes, and because the entire Project was a cumulative effect of the USPS's conceded major federal actions evaluated in the amended environmental assessment. Landmark West! also claims that the USPS violated NEPA by failing to assess other specified environmental effects of the USPS's actions related to the relocation of the Ansonia Station post office.

### 1. The Requirements of NEPA and Associated Regulations

■ NEPA is an "action-forcing" statute that requires agencies to take a "hard look" at the environmental consequences of their proposed actions, and to disseminate the re-

sults of such investigations broadly. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350, 109 S.Ct. 1835, 1846, 104 L.Ed.2d 351 (1989). As such, the statute prescribes procedures, not substantive outcomes. *See id.* ("NEPA merely prohibits uninformed—rather than unwise—agency action").

In particular, Section 102 of NEPA requires federal agencies, "to the fullest extent possible," to prepare an environmental impact statement (EIS) in conjunction with all "major Federal actions significantly affecting the quality of the human environment." [34] Under regulations promulgated by the Council on Environmental Quality (CEQ),[35] "major Federal actions" include "actions with effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18 (1992).[36] In this context, "actions" include "projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies." *Id.* § 1508.18(a).

CEQ regulations provide that any determination of the significance of an action requires consideration of the relation of the action to "other actions with individually insignificant but cumulatively significant im-

---

**34.** This section, 42 U.S.C. § 4332(2)(C), states in relevant part:

[A]ll agencies of the Federal Government shall—

\* \* \* \* \* \*

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agen-

cy which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statements and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review process.

**35.** These regulations are accorded "substantial deference." *Robertson*, 490 U.S. at 355–56, 109 S.Ct. at 1848–49.

**36.** This provision adds: "Major reinforces but does not have a meaning independent of significantly...." *Id.* This statement is at odds with Second Circuit precedent. *See Hanly v. Mitchell*, 460 F.2d 640, 644 (2d Cir.1972) (*"Hanly I"*) ("the two concepts [major and significant] are different"), *cert. denied*, 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972). However, this conflict is not material to resolution of this action.

pacts," [37] and that "[s]ignificance exists if it is reasonable to anticipate a cumulatively significant impact on the environment." *Id.* § 1508.27(b)(7). Further, the regulations make clear that "'cumulative impact' is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." *Id.* § 1508.7.

In addition, CEQ regulations obligate federal agencies to adopt supplemental procedures, including specific criteria for identifying classes of actions that typically require environmental assessments [38] to determine whether an EIS is necessary, and classes of actions that typically require an EIS. *Id.* § 1507.3. The USPS's environmental procedures specify that new construction, "including lease-construction," of a postal facility of 30,000 or more square feet normally requires an environmental assessment, but does not normally require an EIS. 39 C.F.R. § 775.-4(a)(2)(i)(A), (b)(1) (1993).

## 2. Standard of Review

The FONSI issued by the USPS constitutes a formal determination that the actions within its scope will not significantly affect the quality of the human environment and that, therefore, the preparation of an EIS is not warranted. In addition, implicit in the USPS's decision to limit the scope of the

FONSI to its own actions is a second determination that the Project, as a whole, is not a major federal action.

In reviewing the first determination, this Court initially must be satisfied that the procedural requirements of NEPA have been satisfied. In particular, this Court must ensure that the environmental assessment "contains the type of reasoned elaboration required to support the agency's determination of no significant impact" in order to confirm that the USPS "has taken a 'hard look' at the environmental consequences which are likely to result" from its actions. *Town of Orangetown,* 718 F.2d at 35.

If NEPA's procedural requirements are satisfied, it is well settled that this Court must then determine whether the threshold finding that no EIS need be prepared is "arbitrary, capricious or abuse of discretion." *Cross–Sound Ferry Servs., Inc. v. United States,* 573 F.2d 725, 731–32 (2d Cir.1978); *accord Hanly II,* 471 F.2d at 828–29 (citing the Administrative Procedure Act § 10, 5 U.S.C. § 706(2)(A)). Under this standard, the reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there was a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971).

37. The regulations also indicate that significance also depends upon the "degree to which the effects on the quality of the human environment are likely to be highly controversial." *Id.* § 1508.27(b)(4). The Second Circuit has held that neighborhood opposition, *per se,* does not make an action "controversial." *See Hanly v. Kleindienst,* 471 F.2d 823, 830 & n. 9A (2d Cir. 1972) (*"Hanly II"*) (deciding issue in context of earlier CEQ regulation), *cert. denied,* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973); *Town of Orangetown v. Gorsuch,* 718 F.2d 29, 39 (2d Cir.1983) (extending *Hanly II* holding to current form of CEQ regulation), *cert. denied,* 465 U.S. 1099, 104 S.Ct. 1592, 80 L.Ed.2d 124 (1984). Rather, "controversial" refers to situations where "a substantial dispute exists as to the size, nature or effect of the major federal action." *Town of Orangetown,* 718 F.2d at 39 (quoting *Hanly II,* 471 F.2d at 830).

38. CEQ regulations define an environmental assessment as:
> a concise public document for which a Federal agency is responsible that serves to:
> (1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.
> (2) Aid an agency's compliance with [NEPA] when no environmental impact statement is necessary.
> (3) Facilitate preparation of a statement when one is necessary.

40 C.F.R. § 1508.9(a). These regulations also provide that an environmental assessment "[s]hall include brief discussions of the need for the proposal, of alternatives as required by [NEPA] section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." *Id.* § 1508.9(b).

■ In this context, it is arbitrary and capricious for an environmental assessment to "fail[ ] to address a significant environmental concern" resulting from a major federal action, *Foundation on Economic Trends,* 756 F.2d at 154 (citing *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 553, 98 S.Ct. 1197, 1216, 55 L.Ed.2d 460 (1978)), or "for an agency not to take into account all relevant factors in making its determination" that no EIS is required, *Hanly I,* 460 F.2d at 648 (citing *Overton Park,* 401 U.S. at 416, 91 S.Ct. at 824).

Relying primarily on *Kleppe v. Sierra Club,* 427 U.S. 390, 412, 96 S.Ct. 2718, 2731, 49 L.Ed.2d 576 (1976), and *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 377, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377 (1989), LMP argues that this Court also should apply the "arbitrary and capricious" standard to the USPS's second determination, namely that the Project as a whole is not a federal action. However, *Kleppe* and *Marsh* are inapposite because neither case involved review of an agency determination that a particular action was a non-federal action outside of NEPA's reach rather than a federal action subject to NEPA. In *Kleppe,* the Supreme Court reviewed an agency decision to exclude certain federal actions from an EIS assessing the environmental impacts of other federal actions. *See Kleppe,* 427 U.S. at 408–15, 96 S.Ct. at 2729–2733. The *Kleppe* Court applied the "arbitrariness" standard on the grounds that assessing the relatedness and feasibility of the actions, all of which were federal actions potentially subject to NEPA, "requires a high level of technical expertise and is properly left to the informed discretion of the responsible federal agencies." *Id.* at 412, 96 S.Ct. at 2731. Similarly, in *Marsh* the Court used the "arbitrary and capricious" standard to review an agency decision not to supplement an EIS to take account of additional information on the environmental impact of a major federal action. Like the *Kleppe* Court, the *Marsh* Court reasoned that the agency's decision is "a classic example of a factual dispute the resolution of which implicates substantial agency expertise." *Marsh,* 490 U.S. at 376–77, 109 S.Ct. at 1860–61.

■ In contrast, the determination of whether an action is a federal action, as opposed to a private action, depends primarily upon the application of the legal standard "major Federal action" to the relevant facts. When the facts material to a determination of the scope of a "major Federal action"— such as the degree of control the federal agency exerts over related private actions— are in dispute, courts generally are no less expert than agencies in settling such disputes. Further, because such determinations are often implicit, agencies may not have engaged in fact-finding on the issue. For these reasons, courts apply the less deferential "reasonableness under the circumstances" standard in reviewing whether an agency has properly drawn the line between federal action and private action. *See Sugarloaf Citizens Ass'n v. FERC,* 959 F.2d 508, (4th Cir.1992); *Goos v. ICC,* 911 F.2d 1283, 1291–92 (8th Cir.1990); *Sierra Club v. Hodel,* 848 F.2d 1068, 1088–92 (10th Cir.1988).

■ Judicial review of administrative action is generally limited to the administrative record. *See Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743–44, 105 S.Ct. 1598, 1607, 84 L.Ed.2d 643 (1985); *Friends of the Earth v. Hintz,* 800 F.2d 822, 828 (9th Cir.1986). However, because NEPA does not require agencies to document their determinations that certain actions are private actions outside of the scope of NEPA, the administrative record is less complete on this issue than on it is on the issue of the scope of the environmental effects of the conceded federal actions. Therefore, in reviewing that determination, this Court will have recourse to the supplemental affidavits filed respectively by all parties to this action. *Cf. Sierra Club v. United States Army Corps of Eng'rs,* 772 F.2d 1043, 1052 (2d Cir.1985) (endorsing recourse to affidavits from agency when "agency's record is so sparse as to make judicial review ineffectual").

## 3. Review of USPS Determinations Regarding Its Participation in the Project

First, this Court will assess whether the determination that the Project, as a whole, was not a major federal action was "reason-

able under the circumstances." Second, this Court will assess whether the FONSI was "arbitrary and capricious."

### a. The determination that the Project as a whole is not a major federal action was "reasonable under the circumstances"

■ As indicated above,[39] CEQ regulations define "major Federal actions" to include "actions with effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18 (1992). Accordingly,

> [t]he distinguishing feature of "federal" involvement is the ability to influence or control the outcome in material respects. The EIS process is supposed to inform the decision-maker. This presupposes [the decision-maker] has judgment to exercise. Cases finding "federal" action emphasize authority to exercise discretion over the outcome.

*Sierra Club v. Hodel*, 848 F.2d at 1089 (quoting W. Rodgers, *Environmental Law* 763 (1977)); *see also Almond Hill Sch. v. United States Dep't of Agric.*, 768 F.2d 1030, 1039 (9th Cir.1985) (no federal action where indirect federal funding "seem[ed] marginal at most" and where federal officials had no decision-making role). In assessing the degree of federal control and responsibility, this Court must consider both *de jure* and *de facto* influence. *See Goos*, 911 F.2d at 1294. In addition, federal actions with "cumulative or synergistic" impacts must be assessed in combination. *Kleppe*, 427 U.S. at 410, 96 S.Ct. at 2730; *accord City of Rochester*, 541 F.2d at 972–73; *Town of Huntington v. Marsh*, 859 F.2d 1134, 1142–43 (2d Cir.1988).

Landmark West! identifies five actions of the USPS that, in combination, purportedly federalize the Project: (i) "terminating" its lease, (ii) vacating the old Ansonia Station building, (iii) asserting superior sovereignty, (iv) "lending" $15 million to the Project, and (v) paying for its condominium before vacat-

ing the old building. Further, Landmark West! has articulated six theories under which it contends that some or all of these USPS actions make the entire Project a "major Federal action." These theories are: leverage, causation, federal funding, contractual control, partnership, and preventing local environmental review.

■ **Leverage.** Landmark West! emphasizes that the USPS's leasehold interest in the old Ansonia Station gave the USPS leverage to bargain with the Project's developers.[40] However, Landmark West!'s portrayal of this leverage betrays its essentially obstructive, and therefore limited, nature: the USPS "could slow construction and raise costs by forcing LMP to 'build around' an operating post office" and "by doing nothing USPS could force LMP to build a project without Broadway retail space, thus depriving LMP of up to $198 per square foot per year for 16 years."[41] The evidence indicates that the USPS used this limited leverage not to control the design or construction of the Project, other than the New Facility,[42] but rather to obtain favorable financial terms from LMP through arms-length negotiation.[43] The fact that the USPS might have been able to exercise its leverage to control the Project, but did not do so, does not implicate NEPA. *Cf. Defenders of Wildlife v. Andrus*, 627 F.2d 1238, 1246 (D.C.Cir. 1980) ("No agency could meet its NEPA obligations if it had to prepare an environmental impact statement every time the agency had the power to act but did not do so.").

■ **Causation.** Landmark West! also contends that "but for" the actions of the USPS—including its decision to vacate the old Ansonia Station building and accept a promissory note rather than cash in exchange—the Project could not have gone forward. There is no dispute that "but for" the USPS decision to vacate the old Ansonia Station building, the Project would not be

---

**39.** *See supra* note 36 and accompanying text.

**40.** *See* A.R. 4, at 19.

**41.** Plaintiff's Memorandum, at 6.

**42.** *See* Jeffries Aff. ¶ 12.

**43.** *See* A.R. 4, at 19–21; A.R. 6, at 29–31; A.R. 8, at 42–43.

taking its present form. This is not, however, the equivalent of the Project being derailed or radically redesigned. Moreover, the fact that a federal action is a "but for" cause of a non-federal action does not, in itself, subject the non-federal action to NEPA. *See Ringsred v. City of Duluth,* 828 F.2d 1305, 1308 (8th Cir.1987); *Save the Bay, Inc. v. United States Corps of Eng'rs,* 610 F.2d 322, 327 (5th Cir.), *cert. denied,* 449 U.S. 900, 101 S.Ct. 269, 66 L.Ed.2d 130 (1980); *N.A.A.C.P. v. Medical Ctr., Inc.,* 584 F.2d 619, 630–34 (3d Cir.1978); *Sugarloaf Citizens Ass'n,* 959 F.2d at 514.

Rather, federal action must be sufficiently "interrelated" to otherwise non-federal action in order to subject the non-federal action to NEPA. *City of Boston v. Volpe,* 464 F.2d 254, 257–58 (1st Cir.1972); *see also Friends of the Earth, Inc. v. Coleman,* 518 F.2d 323, 328–29 (9th Cir.1975) (federal action must be functionally interdependent with otherwise non-federal action, and not merely complementary, to federalize non-federal action). In this regard, it is significant that the old Ansonia Station building occupied only the western portion of the Site, so it would not have prevented development of the eastern portion of the Site.[44] In order to assess the causative significance of the USPS's actions, this Court need not accept LMP's claim that the "46-story tower that constitutes most of

the [Project] is being built *entirely* on the eastern portion of the Site,"[45] nor determine whether a "similar" project built on the entire Site would have been architecturally feasible had the USPS remained in the old Ansonia Station building.[46] In terms of causation, this Court is satisfied that given LMP's undisputed intention to develop at least the eastern portion of the Site, and absent any evidence that LMP would not have been able to build the bulk of the Project there, the USPS's decision to vacate the old building is insufficient to federalize the entire Project.[47]

**Federal funding.** Landmark West! contends that the USPS's financial participation in the Project constitutes "federal funding" within the meaning of cases holding that such funding federalizes the entire project for NEPA purposes. The USPS did pay LMP $9.8 million for the New Facility, and it also accepted a $15 million promissory note, rather than cash, in exchange for its leasehold interest in the old Ansonia Station building. But the cost of the entire Project has been estimated at more than $250 million.[48] In cases considering whether federal funding federalizes an entire project,[49] courts have considered the degree to which the funding was essential to the project. *See, e.g., Proetta,* 484 F.2d at 1148–49; *Almond Hill,* 768

**44.** Christopher M. Jeffries, a principal of LMP, *see supra* note 17, has indicated that at the time LMP contracted to acquire the Site, he assumed he would be able to redevelop only the eastern portion of the Site. *See* Jeffries Aff. ¶ 2, 4. In fact, LMP's predecessor originally engaged an architectural firm to prepare plans for developing only the eastern portion of the Site. *See id.* ¶ 4.

**45.** Memorandum of Law in Further Support of the Motion for Summary Judgment of Defendants Millennium Partners, Inc. and Lincoln Metrocenter Partners L.P. and in Opposition to Plaintiff Landmark West!'s Cross–Motion for Summary Judgment, at 17 n. 8 (emphasis supplied).

**46.** In *Save the Bay,* where a federal action was a "but for" cause of a private project as proposed, but a modified project could be built in the absence of any federal action, the proposed project was held not to be a major federal action. *See* 610 F.2d at 327.

**47.** Moreover, this Court finds nothing in NEPA to require federal agencies to justify the often implicit determination that a private action is outside of NEPA's scope.

**48.** *See* Jeffries Aff. ¶ 16.

**49.** A number of cases stand for the proposition that non-federal recipients of federal funding can be enjoined from carrying out activities related to the funding pending the funding agency's compliance with NEPA. *See Sierra Club v. Army Corps of Eng'rs,* 732 F.2d 253, 259 (2d Cir.1984); *Proetta,* 484 F.2d at 1148. Closely related cases stand for the stronger proposition that receipt of federal funding requires that the environmental impacts of the funded project, in its entirety, be assessed pursuant to NEPA. *See Friends of the Earth,* 518 F.2d at 326; *Almond Hill,* 768 F.2d at 1039 (citing other cases supporting stronger proposition). As this Court finds that the USPS did not federally fund the Project within the meaning of any of these cases, it need not decide whether the cases that squarely support the weaker proposition fairly can be extended to support the stronger proposition.

F.2d at 1039. Here both the relative magnitude of the USPS's financial participation and an opinion from LMP's financial advisor[50] warrant the conclusion that the USPS's financial participation was incidental to the Project. Thus, even if the transactions between the USPS and LMP involved "federal funding," subjecting the entire Project to NEPA on this basis alone would "let the tail wag the dog." *Friends of the Earth,* 518 F.2d at 329.

■ Nonetheless, this Court cannot accept Landmark West!'s characterization of the $9.8 million payment and the acceptance of a promissory note as "federal funding" as the term is used in NEPA cases. These transactions between the USPS and LMP were part of market transactions that did not give the USPS control over the Project as a whole. It is significant that the CEQ regulation's definition of "major Federal action" excludes certain funding assistance "with no Federal agency control over the subsequent use of such funds." 40 C.F.R. § 1508.18(a) (1992). Further, in cases in which "federal funding" has subjected a project to NEPA, the funding has been active, as opposed to the passive deferral of a payment, and programmatic, in the sense of being provided primarily to directly further a policy goal of the funding agency. *See, e.g., San Francisco Tomorrow v. Romney,* 472 F.2d 1021, 1022 (9th Cir.1973) (urban renewal loans and grants); *Named Individual Members of San Antonio Conservation Soc'y v. Texas Highway Dep't,* 446 F.2d 1013 (5th Cir.1971), *cert. denied,* 406 U.S. 933, 92 S.Ct. 1775, 32 L.Ed.2d 136 (1972) (federal highway aid). In such cases, there is more likely to be federal legislative control over the recipients and uses of such funds, because funds flow from the Treasury pursuant only to Congressional appropriation and control, *see* U.S. Const. art. I, § 9, cl. 7; 31 U.S.C. § 1301 (1988), and because programmatic funding is more likely

to carry regulatory strings than are federal payments for goods or services.

There is no reason to believe that purchase of the New Facility involved anything more than an arms-length payment for the purchase of the New Facility, as opposed to a federal grant to LMP to build the Project.[51] Therefore, while the USPS's purchase of the New Facility required the USPS to prepare an environmental assessment of the New Facility, it did not require the USPS to trace LMP's use of the $9.8 million in order to assess the environmental impact. Similarly, there is nothing to suggest that the USPS's decision to accept a promissory note rather than cash was not a negotiated structuring of LMP's payment for the surrender of the USPS's leasehold. The USPS's decision to accept deferred payment in return for relinquishing the deferred benefit of lower rent payments over the life of the lease carries none of the potential legal strings of a federal loan. Overall, Landmark West! has failed to establish the existence of any legal control by the USPS over the Project resulting from the USPS's acceptance of the promissory note, other than the limited contractual control discussed next.

**Contractual control.** The USPS has extremely limited contractual ability to control the Project, other than the New Facility, particularly with respect to its environmental effects. As documented in the Agreement between the USPS and LMP, the ability of the USPS to influence or control the design and construction of the Project extends almost exclusively to the New Facility, with purely incidental negative control over other aspects of the Project. Under the Agreement, the USPS generally is permitted to veto certain changes and additions to those portions of the Project plans that "pertain to" the construction of the New Facility or the construction of other portions of the Project that would affect sufficiently the use and operation of the New Facility.[52] The Agree-

---

50. *See infra* note 61.

51. Landmark West! makes much of the fact that the payment was made upon closing the purchase, rather than upon completion of the Project. However, this Court declines to hold that payment by a federal agency in advance of delivery constitutes "federal funding" of the supplier

or seller. Further, there is no indication that this advance payment conferred on the USPS *de facto* control over the Project.

52. More precisely, the USPS generally has the power to veto, in its "sole and absolute discretion," any proposed addition or change to the "Approved Plans." *See* Contract of Sale

ment also grants the USPS the limited ability to change the plans pertaining solely to the New Facility, which will constitute 45,000 square feet of a building that will approach 800,000 square feet.[53] Such minimal control is insufficient to federalize the Project. *Cf. Macht v. Skinner*, 916 F.2d 13, 19 (D.C.Cir. 1990) (project is not federalized by fact that federal agency "has discretion over only a negligible portion of the Project").

Further, the Agreement has been structured to insulate LMP from control by the USPS. The Pledge does give the USPS the power to vote against changes in the Lincoln Metrocenter Partners, L.P. partnership

agreement.[54] However, there is no indication that this gives the USPS any control over the size of the Project, its shape, or its uses.[55]

**Partnership.** Landmark West! contends that the degree of the USPS's participation in the Project—particularly the fact that Opera's promissory note to the USPS is secured by Opera's limited partnership interest in LMP—makes the USPS a *"de facto* development partner" of LMP.[56] A number of cases have suggested that a non-federal entity can be subjected to NEPA if it acts in partnership with a federal agency. *See Sierra Club v. United States Army Corps of Eng'rs*, 732

§ 2(d)(ii). The term "Approved Plans" refers to certain plans and specifications—which cover the entire Project from the sub-cellar to the "forty-seventh" floor—but only to the extent that they "pertain to" the provision of "all labor, materials and equipment required for the construction and equipping of (i) the New Facility and (ii) any and all other portions of the Project to the extent that the completion of such other portions of the Project (1) shall be necessary in order to permit the full, safe and lawful . . . use and operation of the New Facility by [the USPS] for its intended purpose, or (2) would prevent or materially interfere with such use and operation" by the USPS. *Id.* §§ 1 and 2(c).

Under the first exception to this general rule, the USPS's veto power does not extend to proposed additions or changes that "(1) shall pertain to [construction outside of the New Facility that, in general, affects the use and operation of the New Facility], (2) shall not materially and adversely affect the New Facility or [the USPS's] use and operation thereof, *and* (3) will not result, in the aggregate, in the extension by more than two months of the outside date by which the Contractor shall have committed to cause the Work to be Substantially Complete." *Id.* §§ 1 and 2(d)(ii) (emphasis supplied).

Under the second exception, the USPS must exercise its veto power "reasonably" with respect to any proposed "change or addition to the Approved Plans which shall constitute, and which the Architect shall, if requested by [the USPS], certify constitutes (i) a mere substitution of materials, equipment or method, provided that the substituted material, equipment or method is of equal or better quality than that theretofore described in the Approved Plans or (ii) any amplification or interpretation of the Approved Plans which is (a) consistent with and (b) reasonably inferable from, or reasonably necessary to effectuate the design intent of, the then Approved Plans." *Id.* §§ 1 and 2(d)(iii).

**53.** *See* Agreement § 2(e) and (g).

**54.** Opera covenanted to the USPS that it "will not consent to any cancellation, alteration, modi-

fication, amendment, or other change in the Partnership Agreement, or waive any material right of [Opera] thereunder, without, in each instance, first obtaining the written consent of the USPS." A.R. 83, at 508 (Pledge ¶ 4(i)). Opera also covenanted not to "withdraw as a partner of the Partnership, or file or pursue, take any action or consent to the taking of any action which may, directly or indirectly, cause a dissolution or liquidation of the Partnership or seek a partition of the Partnerships assess" and not to "consent to a termination of the Partnership Agreement without the prior written consent of USPS." *Id.* at 509 (Pledge ¶ 4(t)).

In addition, if Opera defaults on the Note, the USPS may exercise "all of [Opera's] rights under the Partnership Agreement or at law or equity to exercise and enforce every right, power, remedy, authority, option and privilege of [Opera] relating to the [pledged partnership interest], including, without limitation, any power to terminate, cancel or modify the Partnership Agreement, to execute any instruments and to take any and all other action on behalf of and in the name of [Opera] in respect of the [pledged partnership interest], to make determinations, to exercise any election (including, but not limited to, election of remedies) or option or to give or receive any notice, consent, amendment, waiver or approval, together with full power and authority to demand, receive, enforce, collect or receipt for any of the foregoing or for any property of the Partnership, to enforce or execute any checks, or other instruments or orders, to file any claims and to take any action in connection with any of the foregoing." However, the USPS will not be able to exercise any of its remedies for default until December 1994. *See* A.R. 83, at 511 (Pledge ¶ 7(c)). Therefore, this Court need not assess the significance of exercise of these powers by the USPS.

**55.** *See* Jeffries Supp. Aff. ¶ 4.

**56.** *See* Plaintiff's Memorandum, at 9.

F.2d 253, 259 (2d Cir.1984); *Biderman,* 497 F.2d at 1147; *Proetta,* 484 F.2d at 1148–49; *Dalsis,* 424 F.Supp. at 787.[57] These cases use the term "partnership" to refer to an admixture of factors already analyzed in this opinion—namely, funding, causation, and control. *See Sierra Club v. United States Army Corps of Eng'rs,* 732 F.2d at 259 (partnership rationale requires "necessary nexus" of federal funding); *Biderman,* 497 F.2d at 1147 (partnership or joint venture implies federal funding); *Proetta,* 484 F.2d at 1148–49 (no partnership where non-federal actions could proceed independently of federal funding). The facts of *Dalsis,* the only of these cases in which a "partnership" was found to exist, illustrate the concept of partnership as used in this context. In *Dalsis,* the United States Department of Housing and Urban Development ("HUD") facilitated an urban renewal project by funding the demolition of substandard buildings and by approving, "pursuant to a special environmental clearance," the private development of a mall. *Id.* Although HUD did not directly fund the development of the mall, Judge Elfvin ruled that the private developer could be enjoined in the event HUD failed to comply with NEPA. *Id.* Under these circumstances, HUD was a significant causative factor, both as a matter of law and as a matter of fact, in the private development. More significantly, HUD apparently approved the development only after reviewing its environmental effects, thus providing HUD control over the environmental impact of the development. As discussed above, the indicia of the USPS's *de facto* and *de jure* control over the Project are much weaker in the present case, and the USPS had no control over the environmental impact of the Project as a whole. Accordingly, this Court declines to hold that the USPS entered into a "partnership" with LMP, as that term is used in cases construing the reach of NEPA.

**Preventing local environmental review.** Landmark West! contends that the USPS's ability to invoke superior sovereignty "shields" the entire Project from local environmental review. However, the Project complies with local zoning laws except for the loading docks.[58] The invocation of superior sovereignty will permit the loading docks only if they are used exclusively by the USPS. Since the USPS, the loading docks, and the ability to invoke superior sovereignty are essentially a "package" deal, the Project is not subject to local environmental review regardless of whether the USPS participates.

**Conclusion.** As the USPS has emphasized, the ubiquitous actions and inactions of federal agencies affect the likelihood of private undertakings, as well as their benefits and burdens, in innumerable ways. In this context, it would make no sense to require federal agencies to assess the environmental impact of private actions over which they have no control, solely on the basis of the incidental effects of federal action on the private action. Fortunately, there is no indication that in enacting NEPA Congress intended to do so.

In this case, the USPS has participated, on an arms-length basis, in a private development. Factually, its actions were merely incidental to the private development and, legally, the development has been insulated from USPS control. Accordingly, this Court holds "reasonable under the circumstances" the USPS's implicit determination that the environmental impact of the Project as a whole did not have to be considered in the environmental assessment underlying the FONSI.

**b. The FONSI was not "arbitrary and capricious"**

Landmark West! argues that the FONSI was "arbitrary and capricious" because it was based upon an environmental assessment that failed to consider relevant environmental impacts, including the effects of the Project

---

**57.** Cases relying on the partnership rationale are more explicitly limited than cases relying on the federal funding rationale to the issue of whether a private entity can be enjoined if a federal agency fails to comply with NEPA. *See supra* note 49. Nonetheless, they raise the issue of whether they can be extended to declare that NEPA requires an environmental assessment of the environmental impact of the private entity's actions. Once again, in light of its holding, the Court need not resolve this issue.

**58.** *See supra* notes 22–25 and accompanying text.

as a whole or, at a minimum, a claimed increase in pedestrian and vehicular traffic to the Broadway side of the Project. The neighborhood group advances a number of theories under which the USPS had an obligation to assess these impacts, including the argument that the entire Project is itself an impact of the USPS's "abandonment" of the old Ansonia Station building, and the contention that the entire Project is a "cumulative impact" subject to assessment.[59]

■ Landmark West! argues that the USPS's abandonment of the old Ansonia Station building required the USPS to assess the environmental impact of the proposed subsequent use of the western portion of the Site—specifically, construction of the entire Project. To support this contention, Landmark West! relies upon cases holding that when a federal agency sells federal land, NEPA requires assessment of the environmental consequences of prospective buyers' likely uses of the land. *See Lockhart v. Kenops*, 927 F.2d 1028, 1035–36 (8th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 186, 116 L.Ed.2d 148 (1991); *Conservation Law Found. v. General Servs. Admin.*, 707 F.2d 626, 634 (1st Cir.1983). This Court is extremely hesitant to extend the rule of *Lockhart* from the context of a sale of federally owned land to the context of a substantial

modification of a federal lease for privately owned office space. Even if this Court were to do so, the USPS would not be responsible for assessing the likely future uses of the entire Site. Rather, the USPS would be obligated only to assess the effect of modifying its lease, and of abandoning the old Ansonia Station building, on the reuse of the space that it controlled under the lease. (It should be noted that the USPS controlled only a portion of the old Ansonia Station building, a building that no longer exists.) Without deciding that the USPS was required to do so, this Court observes that the USPS made such an assessment. The USPS expressly determined that a building similar to the Project would be built regardless of whether it vacated the old Ansonia Station building and that, therefore, the effect of its vacating the old building on the reuse of the space was merely a reconfiguration of the uses in the Project.[60] This Court does not find these conclusions to be arbitrary or capricious.[61] Consequently, the USPS considered the rearrangement of space on both vehicular and pedestrian traffic.[62]

■ Landmark West! also contends that the entire Project falls within the "cumulative impact" of the USPS's actions. CEQ regulations define "cumulative impact" as "the impact on the environment which results

---

**59.** Upon consideration of the other theories put forth by Landmark West!, including notions of heightened scrutiny for "controversial" actions and for exercise of superior sovereignty, this Court finds them to be without merit.

**60.** *See* S.A.R. at 20.

**61.** There are five items in the administrative record that support the USPS's conclusion that "[i]n the event that the USPS chooses to remain at its existing location, the private developer would build an Alternative Building that in size and massing would be very similar to the Proposed Building." A.R. at 20. First, an internal USPS memorandum states that "a slightly revised redevelopment project is completely feasible without [USPS] cooperation by leaving us in our current position as tenant and building around the station operation." A.R. 7, at 39. Second, a letter dated from LMP's legal counsel reports that "our client has informed us that it intends to complete the project whether or not the Post Office relocates." A.R. 66, at 236. Third, an "axonomatic" drawing prepared by one of LMP's architects depicts a building constructed around the old

Ansonia Station. *See* A.R. 66, at 244. Fourth, a letter from LMP's financial advisor opines that neither the reconfiguration of the Project in a manner that did not "substantially alter[ ] the size and massing of the building" nor the withdrawal of an existing source of funding would jeopardize the ability to fund the Project. A.R. 66, at 241–42. Fifth, a memorandum to files from the USPS's outside counsel reports that one of LMP's architects stated that "it would not be difficult" to construct a building "since the Ansonia Station sits on rock and the structure above it would be lightweight." A.R. 68, at 248.

Although the USPS might have been less conspicuously uncritical of some of these submissions, we are satisfied that this record is sufficient to support the USPS's determination. For the same reason, there is no merit to Landmark West!'s contention that the notice of intent to prepare an amended environmental assessment was inaccurate in stating that the Project "could proceed without the cooperation of the Postal Service."

**62.** *See* S.A.R. at 50.

from the *incremental* impact of the [federal] action when added to other past, present, and reasonably foreseeable future actions" of others, including private parties. 40 C.F.R. § 1508.7 (1992) (emphasis supplied). Thus, the USPS is required to assess the impacts of its actions in the context of the foreseeable actions of others. *See United States v. 27.09 Acres of Land, More or Less,* 760 F.Supp. 345, 351 (S.D.N.Y.1991). This entails the consideration of the foreseeable actions of others as background factors, but does not require that the impacts of others' actions be weighed in assessing the significance of USPS actions. Rather, the USPS need weigh only the marginal impacts of its own actions.[63]

In preparing the amended environmental assessment, the USPS was obligated to consider all of its actions relating to the Project, including the relocation of the Ansonia Station post office and the construction of the New Facility (including the five loading docks). While the amended environmental assessment typically refers to the federal action being assessed merely as the "relocation" of the USPS operations, it also takes into account the actual construction of the New Facility,[64] and the invocation of superior sovereignty to allow the loading docks,[65] where relevant. Clearly, it would have been preferable for the USPS to make clear that the construction of the New Facility was an action under study. But it was sufficient for the USPS to assess the impact of this construction, without explicitly identifying the construction of the New Facility as federal action.

 As indicated above, it was proper for the USPS not to consider the construction of the Project, other than the New Facility, a federal action.[66] The USPS was obliged to

consider the Project as a backdrop to its own actions, and the USPS did so. The amended environmental assessment acknowledges the proposed Project, as well as other proposed development projects, in its discussion of the proposed USPS's actions on "Land Use and Zoning Patterns."[67] The amended environmental assessment also discusses, as background considerations, the impacts of the proposed Project on traffic and housing.[68]

This Court notes that the emphasis of the amended environmental assessment on the relocation of operations, and the lack of emphasis on the construction of the New Facility and the background influence of other proposed projects, makes the document less than a model of forthright disclosure of potential impacts. However, the Second Circuit has made clear that an EIS, which is a more comprehensive document than an environmental assessment, *compare* 40 C.F.R. § 1508.9 (definition of environmental assessment) *with* 40 C.F.R. § 1508.11 (definition of EIS), need not discuss environmental impacts in "exhaustive detail," but rather need only "furnish such information as appears to be reasonably necessary under the circumstances for the evaluation of the project." *Britt v. United States Army Corps of Eng'rs,* 769 F.2d 84, 91 (2d Cir.1985). The amended environmental assessment addresses all relevant considerations in sufficient detail, so its shortcomings in emphasis cannot be deemed to render "arbitrary and capricious" the FONSI it inspired.

For the foregoing reasons, Landmark West!'s motion for summary judgment is denied, LMP's motion for summary judgment is granted, and the USPS's motion for summary judgment is granted. Accordingly, the complaint is dismissed and the Clerk is di-

---

**63.** Any other interpretation of the CEQ Regulations would vitiate the entire jurisprudence on the distinction bctween federal and non-federal action.

**64.** *See* S.A.R. at 10, 33–34, 51–53, 54–56

**65.** S.A.R. at 13.

**66.** For similar reasons, the entire Project is not a secondary effect of the USPS's participation in it. *See Ringsred v. City of Duluth,* 828 F.2d 1305,

1308–09 (8th Cir.1987) (no assessment need be made of "the environmental effects of privately proposed developments that are outside of the control of the federal government").

**67.** *See* S.A.R. at 42–45. In this section, the Project is referred to by its earlier name, the "Grand Metropolitan." The section on land use impacts is referred to in the section on "Local Employment and Economics."

**68.** *See* S.A.R. at 50.

rected to enter judgment in favor of the defendants.

SO ORDERED.