Steven L. HAMRICK, et al., Plaintiffs,

v.

**GENERAL SERVICES ADMINISTRATION, et al., Defendant.**

**Case No. 15–1023**

United States District Court, C.D. Illinois, **Peoria Division.**

Signed May 22, 2015

Richard S. Porter, Michael F. Iasparro, Hinshaw & Culbertson, Rockford, IL, for Plaintiffs.

Gerard A. Brost, US Atty., Peoria, IL, Peter Kryn Dykema, United States Department of Justice, Washington, DC,

James Roland Griffin, Schain Banks, Chicago, IL, John Matthew Berner, Droel PLLC, Bloomington, MN, for Defendant.

## ORDER

Michael M. Mihm, United States District Judge

On May 7, 2015, this matter came before the Court for a hearing on Defendants Geronimo Wind Energy ("GWE"), LLC, MG2 Tribal Energy, LLC ("MG2" or "MG2 Tribal Energy"), and Walnut Ridge Wind, LLC's ("WRW") (GWE, MG2 and WRW collectively referred to as "Corporate Defendants") Motion to Dismiss (ECF No. 14) and Defendant General Services Administration's ("GSA") Motion to Dismiss (ECF No. 23). During the hearing, the Court stated that it would enter a written order denying the Motions to Dismiss (ECF Nos. 14 and 23). The Court further stated that, based on the Administrative Record (see infra, p. 912), the Court's order would memorialize its finding that GSA's determination that the proposed purchase of wind-produced electric energy and accompanying renewable energy certificates from MG2 Tribal Energy qualified as an automatic categorical exclusion pursuant to Section 5.3(r) of the Public Building Service National Environmental Policy Desk Guide was arbitrary, capricious or otherwise not in accordance with the law. This is that Order.

## OVERVIEW OF PLAINTIFFS' COMPLAINT

On January 16, 2015, Plaintiffs filed their Complaint for Declaratory and Injunctive Relief (ECF No. 1) against the Defendants. Plaintiffs are property owners (or renters) in Bureau County, Illinois, near the proposed wind farm. (ECF No. 1 at 4–10). The proposed wind farm is slated to include 123 industrial wind turbine generators and related facilities on agricultural land encompassing approximately 14,500 acres in Bureau County, Illinois. (ECF No. 1 at 12). The Complaint alleges that WRW is a Delaware Limited Liability Company formed for the purpose of developing and constructing a utility-grade wind farm in Bureau County, Illinois. Id. GWE acquired WRW in 2013. Id. GWE formed MG2 with the Mesa Grande Band of Mission Indians in order to develop the wind power facility in Bureau County while taking advantage of a preference included in 25 U.S.C. § 3502(d). (ECF No. 1 at 11). In September 2014, GSA entered into a ten-year Power Purchase Agreement with MG2 to purchase electricity generated by the wind power facility. (ECF No. 1 at 18). Plaintiffs allege that the Defendants, specifically, GSA, violated the National Environmental Policy Act, ("NEPA"), 42 U.S.C. § 1600–1687 by failing to undertake an environmental analysis or an environmental impact statement prior to entering into a 10–year Power Purchase Agreement with MG2. (ECF No. 1 at 18).

The Complaint specifically seeks a finding from this Court that GSA violated NEPA, and direct GSA to complete an Environment Impact Statement related to the wind power facility. (ECF No. 1 at 20–21). Plaintiffs further request that the Court order GSA and MG2 to cease and desist from reliance upon the Power Purchase Agreement and enjoin GWE and WRW from proceeding with any further development, construction or operation of the wind power facility. (ECF No. 1 at 21).

## ADMINISTRATIVE RECORD

■ This case has been brought by the Plaintiffs under the Administrative Procedure Act, 5 U.S.C. § 500 et. seq. Under the Act, this Court's review is generally "confined to the administrative record to

determine whether, based on the information presented to the ... agency, [its] decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Little Company of Mary Hospital v. Sebelius,* 587 F.3d 849, 856 (7th Cir.2009). On March 3, 2015, GSA filed the Administrative Record, and subsequently, on March 13, 2015, filed a supplement to the administrative record. (*See* ECF Nos. 34 and 36). Plaintiffs objected to the completeness of the record. (ECF No. 38). GSA filed its response to the Plaintiffs' objection, but also further supplemented the Administrative Record. (ECF No. 39 and 43). On April 28, 2015, this Court entered an Order establishing the documents that are appropriately included in the Administrative Record for review in this case. (*See* ECF No. 52). During the hearing held on May 7, 2015, the Court indicated that it seemed appropriate to include the Public Building Service National Environmental Policy Desk Guide (1999) in the record. None of the parties objected to this suggestion. As a result, the Court finds the Administrative Record in this case include the following documents:

- AR 0001 through AR 1729 filed on disc with the Clerk of the Court on March 3, 2015;

- AR 1730 through AR 1771 filed on disc with the Clerk of the Court on March 13, 2015;

- AR 1772 (ECF No. 43–2)—Email dated April 17, 2014, from Mark Romero to Michael Gelber, with the Subject: Renewable Energy Contract;

- AR 1773 (ECF No. 43–1)—Draft of the Applicability of An Automatic Categorical Exclusion from the National Environmental Policy Act;

- AR 1774 through AR 1775 (ECF No. 54–1)—emails between GSA and its Attorney dated September 24, 2013;

- Utility Areawide Guide (ECF No. 45–1);

- Utility (FERC and ICC) on-line searches (ECF No. 45–2); and

- Public Building Service National Environmental Policy Desk Guide (1999) (ECF No. 62).

## FINDINGS OF FACT FROM THE ADMINISTRATIVE RECORD

### Background on renewable energy initiatives

On December 5, 2013, Président Barack Obama issued a Memorandum for Heads of Executive Departments and Agencies regarding Federal Leadership on Energy Management. In that memorandum, President Obama began by explaining that "[i]n order to create a clean energy economy that will increase our Nation's prosperity, promote energy security, combat climate change, protect the interests of taxpayers, and safeguard the health of our environment, the Federal Government must lead by example." (AR 1736). With respect to renewable energy, President Obama outlined the following goal in his memorandum:

Section 1. Renewable Energy Target. (a) By fiscal year 2020, to the extent economically feasible and technically practicable, 20 percent of the total amount of electric energy consumed by each agency during any fiscal year shall be renewable energy.

(b) Agencies shall seek to achieve the renewable energy consumption target set forth in subsection (a) of this section by, where possible, taking the following actions, which are listed in order of priority:

(i) installing agency-funded renewable energy on-site at Federal facilities and retain renewable energy certificates;

(ii) contracting for energy that includes the installation of a renewable energy project on-site at a Federal facility or off-site from a Federal facility and the retention of renewable energy certificates for the term of the contracts;

(iii) purchasing electricity and corresponding renewable energy certificates; and

(iv) purchasing renewable energy certificates.

(c) Agencies shall ensure that 100 percent of renewable energy certificates identified in subsection (b)(iii) and (b)(iv) of this section are produced by new renewable sources as defined in section 5(c) of this memorandum.

\* \* \*

Sec. 5. Definitions. As used in this memorandum:

\* \* \*

(b) "New renewable sources" means sources of renewable energy placed into service within 10 years prior to the start of the fiscal year.

(AR 1737–39).

**History of activities and negotiations resulting in the contract for renewable energy**

On or around August 13, 2013, individuals from GSA had a meeting with individuals representing at least some of the Corporate Defendants (or their interest[1]). (AR 1; AR 142). During that meeting, the Corporate Defendants presented a proposal on meeting the renewable energy goals of GSA. (AR 3). The proposal specifically stated that a power purchase agreement was needed in order to justify making an investment in the project. (AR 8, the proposal states "Need power purchase

agreement for project to justify making investment to qualify for [Production Tax Credit]"). The proposal also noted that there was a need to move quickly in order to take advantage of the Production Tax Credit and that MGG Energy qualified for federal preference in energy sales under the Indian Energy Act of 2005. (AR 12).

Discussions continued via email communications between representatives of GSA and the Corporate Defendants after the initial meeting. (See e.g. AR 1 et seq.). These discussions included an examination of a potential preference for tribal entities (see e.g. AR 150) and the energy being delivered into the PJM Interconnection (see e.g. AR 138). Notably, 25 U.S.C. § 3502(d) provides that "[i]n purchasing electricity or any other energy product or byproduct, a Federal agency or department may give preference to an energy and resource production enterprise, partnership, consortium, corporation, or other type of business organization the majority of the interest in which is owned and controlled by 1 or more Indian tribes." (See also AR 1728).

As way of additional background, PJM Interconnection is a regional transmission organization ("RTO") approved by the Federal Energy Regulatory Commission that is generally tasked with the responsibility for calculating available transfer capability across the geographical area included in the RTO, as well as the planning and expansion of the transmission grid, at least for facilities necessary for maintaining system reliability. GSA indicated that it sought renewable energy and renewable energy certificates from this geographical area.

Perhaps influenced by the discussions, GSA ultimately issued a solicitation that

---

1.  The presentation was presented by MGG Energy described as a Joint Venture between the Mesa Grande Band of Mission Indians and Geronimo Energy. (AR 2).

included many specifications that had been discussed between the parties. The solicitation dated August 28, 2013, provided:

> The General Services Administration is requesting proposals from Tribally-owned entities for the provision of electric supply and accompanying renewable energy certificates (RECs) within the PJM grid control area from a new renewable energy resource for delivery to PJM beginning in 2015. Projects proposed must be in the PJM Interconnection Queue. Contracts must be for no more than a 10 year period and offer prevailing market prices and prevailing market terms and conditions. A 10 year true option period is a possibility. Reponses are due no later than 11:00 am on September 3, 2013 via email to the Contracting Officer.

(AR 163). Not surprisingly, on August 29, 2013, MG2 Tribal Energy submitted a proposal in response to the solicitation. (AR 165–66). In fact, MG2 Tribal Energy's proposal was the only one submitted in response to the August 28, 2013, solicitation[2]. (AR 276).

Discussions continued thereafter between the Corporate Defendants and GSA, much of it focusing on technical aspects of the project and the potential language of the power purchase agreement. (*See e.g.* AR 249, *et seq.*). At some point the parties began discussions on the NEPA requirements. (AR 302). While the email communications don't specifically identify the date the discussions began, on September 26, 2013, GSA[3] emailed MG2[4] explaining that GSA's legal staff had determined that NEPA would not apply. (AR 302–03). MG2 requested an opportunity to review the draft of the NEPA determination prior

to it being signed "[ ] to make sure that the language in there is what is needed to get [MG2's] tax equity financiers comfortable [ ]." (AR 302). On that same day, GSA issued its NEPA determination stating:

> In accordance with the GSA Public Building Service National Environmental Policy Act (NEPA) Desk Guide, the GSA Energy Division has determined that the proposed purchase of wind produced electric energy and accompanying renewable energy certificates from MG2 Energy for energy output from its Walnut Ridge Wind Farm located in Bureau County, Illinois qualifies for an Automatic Categorical Exclusion (CATEX). In particular the Automatic CATEX set forth in Section 5.3(r) of the Desk Guide, which exempts from detailed NEPA analysis the following types of action:
>
> > Assisting Federal agencies in public utilities management (excluding communications), negotiating for public utility services on behalf of Federal agencies, and providing expert testimony before public utility bodies.
>
> In addition, the purchase of wind produced energy and accompanying renewable energy certificates does not, in this case, appear to raise any extraordinary circumstances that would compel a higher level of NEPA study. This is so even in the case at hand: energy and energy certificates from the operation of a new wind farm.

(AR 300). The Administrative Record is void of much analysis related to the NEPA determination. By way of this Court's Order dated April 30, 2015, two email communications between GSA and its attorneys are included in the Administrative

---

**2.** Given the lead time necessary to create a new renewable energy resource, a 7–day window for proposals certainly put MG2 at a significant advantage in its submission.

**3.** Through Ken J. Shutika ("Shutika").

**4.** Through Drew Terwilliger ("Terwilliger").

Record. (*See* ECF No. 52 and ECF No. 54–1 (AR 1774–75)).

Thereafter, the Defendants had several other discussions regarding NEPA. The record shows that at one point GSA (Shutika) invited MG2 (Terwilliger) to have his attorneys contact GSA's attorneys if they have any questions on GSA's determination that NEPA did not apply. (AR 312). In the various email exchanges between Shutika and Terwilliger, there were discussions about setting up a phone call with attorneys for the purpose of "helping [Corporate Defendants] make sure that everything [they] put together on this NEPA issue will be sufficient for wind energy's tax equity investors who are notoriously paranoid and strict on these types of items." (AR 311). On October 24, 2013, via email, GSA (Shutika) also inquired about additional information about the proposed phone call noting "[m]y environmental attorney would like to know in advance of any meeting what types of concerns/issues regarding NEPA that your attorneys may have so that she can be prepared for the meeting." (AR 317) (The email exchange also indicates that the phone call would occur on October 25, 2013, or October 29, 2013). There is no additional discussion between the parties about the NEPA issue after the October 24, 2013, email communication. (AR 317). But the parties continued to discuss the power purchase contract. (AR 321 *et seq.*). Internally, GSA continued to determine the overall feasibility and direction of the project. (*See e.g.* AR 496, 505).

Ultimately, on or around December 8, 2013, GSA determined that it would pass on the tribal wind project, and on December 11, 2013, that information was passed on to MG2. (AR 506, 516–17). However, the parties continued to discuss the possible resurrection of the project. (AR 519). And the subsequent email communications between the parties indicated that the project could be revived. (*See e.g.* AR 675).

On or around February 25, 2014, the Administrative Record indicated that the project was "in official review and approval process [ ]." (AR 753; *see also* AR 772, email dated March 10, 2014, between GSA (Shutika) and MG2 (Terwilliger) explaining that "[GSA is] at the end stages of the review process here and the high level reviewers had a question or two about Geronimo Energy's experience, etc."). Apparently there were some concerns regarding the procedural course and on May 15, 2015, GSA (Shutika) notified MG2 (Terwilliger) that "[GSA] leadership [had] determined that the appropriate course of action [was] to hold a competition to obtain renewable power [and GSA] plan[ned] to issue a request for proposal in the near future that would enable the project [GSA and MG2 had] been working with on to offer." (AR 789).

On May 30, 2014, a new solicitation for renewable electric power supply for various Federal Accounts in PJM was issued. The solicitation stated:

> The General Services Administration is requesting proposals from small businesses for the provision of grid based electric supply with or without accompanying renewable energy certificates RECs within the PJM grid control area from new renewable energy resource for delivery to PJM beginning in 2015/16. To be considered new renewable projects may not have initiated deliveries into the grid prior to the closing date for this request for proposals. Projects proposed must have PJM Interconnection Agreement in place or be near to final approval. Contracts must be for no more than 10 year period. A 10 year option period will be considered. GSA will not consider projects that are contingent on the extension of the wind

Production Tax Credit PTC. There is no minimum or maximum renewable resource size, however, GSAs renewable need in 2020 to meet the Administrations 20% renewable purchase goal for GSA is approximately 500–550000 MWhs. In addition GSA has approximately 810000 MWhs of annual electric usage in deregulated PJM markets GSA also purchases significant amount of power in PJM deregulated markets for Federal and non-Federal agencies. To the extent economically advantageous GSA will consider purchasing in excess of the 20% figure GSA will consider all renewable resource types that meet the Federal definitions of renewable power. In any resulting contract GSA will only pay for renewable power delivered to the PJM grid GSA will generally make all payments to the contractor via transaction management firm/energy supplier that GSA will contract for separately. Proposals must include the following copy of the PJM Interconnection Agreement an in-depth description of the new renewable resource project the PJM node where deliveries will occur an Excel spreadsheet with one year of modeled hourly output to the PJM node pricing for each year in $/MWh for the renewable energy the escalation factor included in pricing the offeror's DUNS number the offeror's System for Award Management SAM registration proposed contract terms and conditions and any additional information that the offeror believes would assist GSA in evaluating the project Multiple awards will be considered.

Evaluation Projects with signed PJM Interconnection Agreement are preferred although projects nearing final interconnection approval will be considered. GSA will evaluate proposals by determining the market value of the renewable energy to be produced by the new renewable energy resource and compare that to the pricing proposed. If included in the proposal, GSA will determine the market value of any RECs/SRECs proposed and compare that to the pricing proposed GSA will rank order the projects proposed based on the most favorable from an economic standpoint to GSA. For those projects that GSA deems favorable GSA will seek to negotiate acceptable contract terms and conditions. GSA at its discretion may elect to include or not include the RECs/SRECs in any resulting contract depending on the economic value and risk to GSA. GSA encourages tribal entities to offer and will provide preference for such entities to the extent authorized by Public Law No 109–58 codified at 25 U.S.C 3502d. GSA makes no guarantee of award to favorable projects as award will be contingent upon reaching acceptable terms and conditions.

(AR 790–91). Notably, many of the terms contained in the second solicitation involved matters specifically discussed between the parties. (AR 519 *et seq.* ).

On June 20, 2014, MG2 submitted its Renewable Electric Power Supply Proposal in response to GSA's second solicitation for renewable energy. (AR 794). The Administrative Record does not indicate that any other entity submitted a proposal. On September 24, 2014, GSA and MG2 Tribal Energy, LLC entered into the Renewable Energy Contract. (AR 1212–72).

### NATIONAL ENVIRONMENTAL POLICY ACT

***Purpose of the Act***

■ The purpose of NEPA is to set forth a broad national commitment to protecting and promoting the environment. *See Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, 109 S.Ct. 1835,

104 L.Ed.2d 351 (1989). Indeed, NEPA is intended to guarantee that government agencies are informed of and fully consider environmental consequences when undertaking "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. sec. 4332. However, NEPA "does not mandate particular results, but simply prescribes the necessary process. If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Robertson*, 490 U.S. at 349, 109 S.Ct. 1835 (1989).

In that regard, Section 102 of the NEPA requires federal agencies to incorporate environmental considerations in their planning and decision-making through a systematic interdisciplinary approach. There are several ways in which a federal agency can adhere to its obligation under NEPA. First, federal agencies may be required to prepare detailed statements assessing the environmental impact of and alternatives to major Federal actions significantly affecting the environment. These statements are commonly referred to as Environmental Impact Statements (EISs). *See* 40 C.F.R. § 1508.11. The federal agency may also determine that the proposed action or project is categorically excluded from the EIS process.

Categorical exclusion means a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations (§ 1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required. An agency may decide in its procedures or otherwise, to prepare environmental assessments for the reasons stated in § 1508.9 even though it is not required to do so. Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect.

40 C.F.R. § 1508.4. Finally, the federal agency may prepare an Environmental Assessment ("EA"), which is a document to "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." *See* 40 C.F.R. § 1508.9. In this case, neither an EIS or EA were prepared because GSA found that a categorical exclusion applied.

It should also be noted that "NEPA's requirements are not solely designed to inform the federal agency of the environmental consequences of its action. "NEPA documentation notifies the public and relevant government officials of the proposed action and its environmental consequences and informs the public that the acting agency has considered those consequences." *Catron County Board of Commissioners v. United States Fish and Wildlife Service*, 75 F.3d 1429, 1437 (10th Cir.1996).

Because GSA determined that a categorical exclusion applied to this project, the Court finds it necessary to provide a further explanation of the exclusion under GSA's policy. Under the Public Building Service National Environmental Policy Desk Guide, there are two types of categorical exclusions—automatic categorical exclusions ("Automatic CATEX") and categorical exclusions requiring completion of a checklist ("Checklist CATEXs"). (*See* ECF No. 62). Automatic CATEX are defined in the PBS NEPA Desk Guide as "actions that, by their nature, obviously have no potential to affect the environment." If an action is deemed an Auto-

matic CATEX, '[s]uch action[ ] may be excluded from further NEPA review without analysis of any kind, except [ ]" "[t]here may be circumstances –although they are almost unimaginable—in which an [A]utomatic CATEX action could have significant impacts on the environment [ ]" and, if such a case exist, "[the reviewer] should take the action through further review by completing the checklist used with "Checklist CATEX's." (ECF No. 62 at 44).

Throughout this case, both parties provided significant argument on the term "major Federal action." The Code of Federal Regulation provides:

> Major Federal action includes actions with effects that may be major and which are potentially subject to Federal control and responsibility. Major reinforces but does not have a meaning independent of significantly (§ 1508.27). Actions include the circumstance where the responsible officials fail to act and that failure to act is reviewable by courts or administrative tribunals under the Administrative Procedure Act or other applicable law as agency action.
>
> (a) Actions include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals (§§ 1506.8, 1508.17). Actions do not include funding assistance solely in the form of general revenue sharing funds, distributed under the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. 1221 et seq., with no Federal agency control over the subsequent use of such funds. Actions do not include bringing judicial or administrative civil or criminal enforcement actions.
>
> (b) Federal actions tend to fall within one of the following categories:
>
> (1) Adoption of official policy, such as rules, regulations, and interpretations adopted pursuant to the Administrative Procedure Act, 5 U.S.C. 551 et seq.; treaties and international conventions or agreements; formal documents establishing an agency's policies which will result in or substantially alter agency programs.
>
> (2) Adoption of formal plans, such as official documents prepared or approved by federal agencies which guide or prescribe alternative uses of Federal resources, upon which future agency actions will be based.
>
> (3) Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive.
>
> (4) Approval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities.

40 C.F.R. § 1508.18 The phrase "major Federal action" has been construed by the Courts to require an inquiry into the amount of federal funds expended by the action, the number of people affected, the length of time consumed, and the extent of the government planning involved. *Hanly v. Mitchell,* 460 F.2d 640, 644 (2nd Cir. 1972) *cert. denied,* 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972).

## DISCUSSION

The Court begins its administrative review with the issues and arguments surrounding GSA's determination that the Automatic CATEX applied to the project. GSA determined that the proposed purchase of wind-produced electric energy and accompanying renewable energy certificates from MG2 qualified as an automatic categorical exclusion pursuant to Section 5.3(r) of the Public Building Service National Environmental Policy Desk Guide. Section 5.3(r) provides:

The following are automatic CATEXs and require no checklist:

* * *

(r) Assisting Federal agencies in the public utilities management (excluding communications), negotiating for public utility services on behalf of Federal agencies, and providing expert testimony before public utility regulatory bodies.

(ECF No. 62 at 46).

The Plaintiffs argue that the Automatic CATEX does not apply because: (1) the Renewable Energy Contract is not for public utility services; (2) no CATEX determination was made when the second solicitation was issued that resulted in the Renewable Energy Contract and (3) the Renewable Energy Contract is more than just a power purchase agreement. The Court will examine each argument in turn.

### Public utility services

Plaintiffs argue that MG2 (and the other Corporate Defendants) is not a licensed public utility under any Federal or State regulatory body. (ECF No. 56 at 7). As such, the Plaintiffs argue that any resulting contract with this entity cannot be considered one for "public utility services" as required for the Automatic CATEX to apply. *Id.* In support of their position, Plaintiffs direct the Court to GSA's Utility Areawide Guide, noting that the definition of "Utility" in the GSA document is "a public—or investor-owned utility company that falls under the regulation of a state Public Utility Commission (PUC)." (ECF No. 45–1). The Plaintiffs further argue that the contract is not only for the power, but also includes renewable energy certificates, which are not public utility services, but rather a commodity that can be traded on the open market.

The Defendants argue that the Utility Areawide Guide is inapplicable to the type of contract GSA has entered into in this case and the definition of "public utility services" is broader under various decisions made by the Comptroller General. Defendants also argue that GSA's acquisition of renewable energy credits in addition to the electricity does not take exceed the definition of public utility service. There is no question that MG2 is not a "Utility" as that term is defined in the Utility Areawide Guide. (*See* ECF No. 45–2; *see also* AR 679 noting that "MG2 Tribal Energy is not a FERC registered market participant, we would contract with an entity to provide the service of selling the power into the PJM market.").

The Court finds that the term "public utility services" as used in the Automatic CATEX is broad enough to include the purchase of energy and renewable energy credits. The Court would first note that the Utility Areawide Guide is inapplicable to the present situation. The Utility Areawide Guide notes that an Areawide Contract "cannot be used when more than one utility company offers the same services in an area." (ECF No. 45–1 at 7) An Areawide Contract is defined as "[a] master contract entered into between the Government and a utility service supplier to cover the utility service acquisition of all Federal agencies in the *franchised certified service territory* from the particular

utility service provider for a period not to exceed 10 years." (ECF No. 45–1 at 6)(Emphasis added). The Utility Area-wide Guide recognizes that agencies may, in a deregulated energy sector, ultimately want to procure energy services from another company—not simply the "Utility." (ECF No. 45–1 at 6, "The GSA Areawide Contract can fit easily into an Agency's deregulation plan, because utilizing the services of the Contracting Utility under the GSA Areawide Contract does not in any way preclude an Agency from using the services of an energy service company or another utility."). For information regarding deregulation in Illinois, *see* the Electric Service Customer Choice and Rate Relief Law of 1997, 220 Ill. Comp. Stat. Ann. 5/16–101, *et seq.* Those public utility services—with respect to electricity—can include the electric supply, transportation and distribution services. Simply put, the limited definition of "Utility" in the Utility Areawide Guide is inapplicable to this case.

■ The Court further recognizes that "[an] agency's interpretation [of its own regulations] must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Smith v. Office of Civilian Health & Med. Program of Uniformed Servs.,* 97 F.3d 950, 955 (7th Cir.1996) *citing Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 2386, 129 L.Ed.2d 405 (1994) (internal quotation marks omitted); and *Hinsdale Hospital Corp. v. Shalala,* 50 F.3d 1395, 1399 (7th Cir.1995). Here, GSA is relying on various Comptroller General's decisions to justify the reasonableness of its interpretation of "public utility services." (ECF No. 29 at 2). GSA notes that when Congress enacted the Federal Property and Administrative Services Act of 1949, it authorized GSA to enter into "contract[s] for public services" not to ex-

ceed ten years. 40 U.S.C. § 501(b)(1)(B); (*see also* ECF No. 29 at 2). In directing the Court to Comptroller General's decisions, it is clear that the Comptroller General has interpreted the term "public utility" as applying to non-regulated entities. In a 1965 decision, the Comptroller General, in examining a contract to purchase natural gas, explained:

> The status of the pipeline company as a public utility under Title 42 of the Alaska statutes is, in our opinion, doubtful. We are of this view because the company is not subject to regulatory control and because it has not served the pubic generally with natural gas. But the Congress has authorized long-term contracting in the case of services having public utility aspects. In doing so the Congress did not require that these public utility services be procured only from those firms which clearly come within the strict legal definition of a "public utility." Perhaps in recognition of the legal imponderables involved in the application and enforcement of state laws regulating public utilities, and in the view of the diversity of opinions between various jurisdictions respecting the legal character of public utilities, *the Congress in its judgment determined to categorize the service rather than the contractor.* Since "gas" is defined a utility, and since the contract provides for the furnishing of public utility gas services, we would not feel required to question the authority for the contract.

*To the Sec'y of Def.,* 45 Comp. Gen. 59, 64 (Aug. 5, 1965)(Emphasis added). Other Comptroller General opinions reached the same conclusion. *GSA Procurement of Equip. Under 40 U.S.C. § 481,* 62 Comp. Gen. 569, 575 (July 21, 1983) (Holding that "[ ] it is the nature of the product or service provided and not the nature of the provider of the product or services that governs the application of 40 U.S.C.

§ 481(a)(3).").  The Court recognizes, as the Plaintiffs point out, that the Comptroller General advisory opinions are not controlling on this Court.  *See Iceland S.S. Co.-Eimskip v. U.S. Dep't of Army,* 201 F.3d 451, 459 (D.C.Cir.2000) ("While the Comptroller General's opinion is not binding precedent, we agree that the existence of affiliation does not negate the presence of 'competition' in the usual sense of that word.").  However, the inquiry is not whether or not the Comptroller General advisory opinions are wrong or right, but whether GSA's reliance on the opinion for its interpretation of "public utility services" is reasonable.  Ultimately, the Court finds that it is reasonable for GSA to interpret its "public utility service" as the products offered, not as what entity is providing them.

For similar reasons, the Court finds that renewable energy certificates are included in the term "public utility service."  The Administrative Record provides that "renewable energy certificates" means the technology and environmental (non-energy) attributes that represent proof that 1 megawatt-hour (MWh) of electricity was generated from an eligible renewable energy resource, and can be sold separately from the underlying generic electricity with which it is associated."  (AR 1740).  In the end, the renewable energy certificate is a designation for a type of energy—purchasable just like a regular MWh—but when coupled with the actual MWh, designates "renewable" or "green" electricity.  Such electricity can be offered to residential customers of public utilities or is otherwise required to be included in an electric supplier's portfolio.  *See e.g.* 220 ILCS 5/16–115D (renewable portfolio standards for alternative retail electric suppliers) and 83 Ill. Admin.  Code § 455.110 (Obligation to Procure Renewable Energy Resources.

### Second solicitation

Plaintiffs argue that GSA's second solicitation should have resulted in another review of the agency's NEPA obligation.  Plaintiffs specifically argue that the original solicitation was only one paragraph in length and the second solicitation was two pages and contained numerous substantial differences.  *See supra,* pp. 916–18.  Those differences highlighted by the Plaintiffs included new definitions (including the definition of "new" renewable energy), the requirement that the electricity is a result of wind turbine, and the specific amount of the electricity being sought.  Defendants argue that there is an abundance of case law that addresses situations where a change in the project would result in whether a NEPA analysis should be revisited.  Defendants note that a situation where there is no material change does not require such a revisit.  Ultimately because this Court is remanding the case back to the GSA for further consideration, this issue becomes moot.  Nonetheless, the Court will address the issue further to highlight the problematic area it finds in the solicitations.

While the briefing does not directly reflect any specific discussion regarding this matter, the parties amply argued it during the hearing held on May 7, 2015.  Defendants correctly note that supplementation is required in situations where there "are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c)(1)(ii).  Here, a side-by-side review of the solicitations lead this Court to find that—at least with respect to the changes identified by the Plaintiffs at the hearing—there was no material change in the two solicitations.  The purpose of both solicitations was to procure electric supply from a renewable energy source.  The difficulty with both

solicitations, from this Court's view, is the fact that the solicitations specifically sought the procurement of "new" electricity. This leads the Court to the Plaintiff's final argument.

***The solicitation is for more than just a power purchase agreement***

From the beginning, Plaintiffs have argued that the contract entered into by GSA with MG2 is for more than just the purchase of electric power. In their Complaint, Plaintiffs argue that:

> The Power Purchase Agreement, the project is a major federal action because it is in effect "entirely or partly financed, assisted or conducted" by GSA. Through the PPA, GSA is now, and will in the future, actively finance, assist and/or conduct the Project.

(ECF No. 1 at 20).

> The Power Purchase Agreement entered into between GSA and MG2 is a major federal action. The agreement is for a term of 10 years, and binds the federal government to purchase 140 megawatts of power from the Walnut Ridge wind farm, estimated to produce approximately 500 gigawatt hours of electricity annually. According to GSA's own press release announcing the agreement, it is the "largest wind energy purchase from a single source in federal contracting history."

(ECF No. 1 at 18).

> The PPA provides Defendants GERONIMO and WRW with the ability, including the financial security, to move forward with development, construction and operation of the Walnut Ridge wind farm, which they and their predecessors have heretofore not done due to the lack of financial ability and security to move forward with the Project.

> Upon information and belief, the future development, construction and operation

of the Project would not be possible without the PPA.

(ECF No. 1 at 19). Plaintiffs previously directed this Court to provisions in the Renewable Energy Contract suggesting that GSA had control over certain aspects of the project, including the access to meters and reviewing maintenance. Defendants argue that there is no GSA control over the project.

The Court notes that at this point there is somewhat of an intersection between the review of the Automatic CATEX determination and whether the project is a "major Federal action." The Court will do its best to address both issues separately.

■ Under the Public Building Service National Environmental Policy Desk Guide, a decision regarding the applicability of an Automatic CATEX requires the reviewer to define the proposed action and alternatives. (ECF No. 62 at 35); *see also* Environmental Considerations in Decisionmaking, 65 FR 69558–01 (Nov. 17, 2000), wherein GSA announced that it was publishing final revised internal GSA procedures dated October 19, 1999, to be followed in implementing the requirements of section 102(2) of the National Environmental Policy Act of 1969. After that, the reviewer must determine if the project is likely to be a CATEX, and determine the type of CATEX. *Id.* That review requires an examination of whether "extraordinary circumstances" exist. *Id.* In this particular case, there is no indication that GSA considered the fact that its solicitation specifically sought power from a "new" renewable resource either properly fell under the Automatic CATEX or created "extraordinary circumstances" that required it to delve further into the environmental issues. *Id.*

The Public Building Service National Environmental Policy Desk Guide suggests that even if a CATEX applied, cer-

tain circumstances require additional consideration. (ECF No. 62 at 44, "If GSA is proposing an action where an alternative is an Automatic CATEX [purchase of power] and one is a checklist CATEX (that is, requires the preparation of a CATEX checklist) [perhaps the purchase of power from a new source], you must perform the more rigorous of the two CATEX options for the action. The checklist may result in a CATEX or indicate the need for EA or EIS. For example, if GSA is proposing to locate office space either by leasing existing space or by lease construction, you must prepare a checklist on the lease construction alternative to ensure that its potential impact ha[s] been considered, even though use of the existing space alternative qualifies as an automatic CATEX."). The fact that the record is void of any such consideration dooms the GSA's determination in this case. *See Rhodes v. Johnson*, 153 F.3d 785 (7th Cir.1998) (Court remanded the case back to U.S. Forest Service for an EA finding that the plain language of the agency's Environmental Handbook required an EA in a situation where extraordinary circumstances were present even though a categorical exclusion was applicable.). Moreover, the Administrative Record is void of any attempt by GSA to determine the purpose and need of the project. (*See* ECF No. 62 at 32, the Public Building Service National Environmental Policy Desk Guide provides that the first step is to determine how much environmental analysis is needed. "That is, clearly specify what GSA is trying to accomplish, and why. For example, the Corps of Engineers may need to establish a new district office in a given area, in response to Congressional direction, and the purpose of a GSA space action might be to accommodate that need."). Here, GSA's Acquisition Plan states that the Contract is meant to "facilitate new renewable resource construction;" and that "the

renewable energy is tied to a specific new project that will be developed [in the PJM grid]." (AR 1758–68).

GSA attempts to shield itself from any environmental responsibility by resting on the applicability of the Automatic CATEX for power purchase. Undoubtedly, the Government's purchase of electricity has an effect on investment in infrastructure and facilities related to electricity—that can only be expected. That general need will result—at least in this Court's view—in an effect on the environment. But can fall under the Automatic CATEX. The Government's goal of shifting its electricity needs to renewable energy is a laudable action. In this particular case, however, the Government's action is directly traceable to the creation of new facilities. The Administrative Record is clear on this point. MG2's initial presentation to GSA specifically provides that it "[n]eed[s the] power purchase agreement for project to justify making investment to qualify for [Production Tax Credit]." (AR 173). In subsequent discussions MG2 (Tewilliger) explained that "[a]s mentioned on our call, the time is important to us, the sooner we can finalize a contract, the better chance we have of getting the project successfully financed." (AR 557). And the use of Government funds for the purchase of this power is significant. While the record does not provide a specific number, it certainly indicates that the project could have had a value of $180 million. (AR 780; *see also* AR 1760 indicating the value of the contract could be $250M). Given the size, scope and nature of the purchase of "new" renewable energy, the Court cannot find that GSA's cursory determination that the proposed purchase of wind-produced electric energy and accompanying renewable energy certificates from MG2 Tribal Energy qualified as an automatic categorical exclusion pursuant to Section 5.3(r) of the

Public Building Service National Environmental Policy Desk Guide reasonable. Certainly not on the record before the Court.

The problem is GSA did not consider, at least based on this record, the possibility of *any* environmental consequences, or the possibility of "extraordinary circumstances" in reaching its determination that the automatic CATEX applied. (*See e.g.* ECF No. 1 at 16–17, wherein the Plaintiff alleged that some of the negative affect to the use and enjoyment of their property will include creating incessant and annoying noise, creating visual disturbances, destroying vistas and vies, creating excessive traffic and noise from construction, creating hazards from ice and fire, negatively impacting the amount and number of wildlife, increasing mosquito population by decreasing bat population, causing sleep deprivation, negatively impacting pet and livestock, and creating dust; *compare with* AR 1207, benefits of wind farm). In the end, the Court finds that GSA's determination that the proposed purchase of wind-produced electric energy and accompanying renewable energy certificates from MG2 Tribal Energy qualified as an automatic categorical exclusion pursuant to Section 5.3(r) of the Public Building Service National Environmental Policy Desk Guide was arbitrary, capricious or otherwise not in accordance with the law.

### Major Federal action

Each party has thoroughly set forth their position on whether or not the resulting contract is a major Federal action. Plaintiffs' position is provided above. (*See supra,* pp. 922–23). Defendants argue the Renewable Energy Contract cannot be construed as a federal action and it certainly did not federalize the project because GSA isn't controlling the project; it's not owning the project, it's not financing the project, it's not operating the pro-

ject, and it's not funding the project. (ECF No. 55 at 8).

The Court begins by stating the obvious—clearly GSA recognizes it is obligated to consider this project under NEPA in light of the fact that contracts for the purchase of power are specifically included in its Public Building Service National Environmental Policy Desk Guide. Put another way, it appears, certainly intuitively, that GSA has determined that each of its automatic CATEXs are "major Federal actions," but are exempt from any further review because such projects do not have a "significant effect on the human environment." Certainly there is no reason to find that these actions are categorically excluded from a NEPA analysis if NEPA does not apply. Nonetheless, to fully satisfy the question of whether the project is a major Federal action, the Court provides the following discussion.

The question of what is a "major Federal action" is often litigated. Cases have explained that Federal funding alone is not enough to transform a program into a "major Federal action" governed by the NEPA; there must be federal decision-making power, authority, or control over the program at issue to render it a major Federal action. *Center for Biological Diversity v. U.S. Dept. of Housing and Urban Development,* 541 F.Supp.2d 1091 (D.Ariz.2008), affirmed 359 Fed.Appx. 781, 2009 WL 4912592 (Decisive factor in such determination is discretion accorded agency actor in carrying out proposed project and, the greater the degree of discretion involved, the more likely that the project constitutes major Federal action, while the lesser the degree of discretion makes it more likely that the project does not constitute such action.). The phrase "major Federal action" has been construed by the Courts to require an inquiry into such questions as the amount of federal funds

expended by the action, the number of people affected, the length of time consumed, and the extent of government planning involved. *Hanly,* 460 F.2d at 644; *Natural Resources Defense Council v. Grant,* 341 F.Supp. 356, 366–67 (E.D.N.C. 1972).

Defendants argue that it isn't enough that the Federal action is the "but for" cause. (*See* ECF No. 55 at 4); *see also Landmark West! v. U.S. Postal Serv.,* 840 F.Supp. 994, 1006 (S.D.N.Y.1993), *aff'd,* 41 F.3d 1500 (2d Cir.1994) ("[T]he fact that a federal action is a 'but for' cause of a non-federal action does not, in itself, subject the non-federal action to NEPA.'"). In *Landmark West!,* a neighborhood group called Landmark West! sought to halt the construction of a skyscraper being developed by a private company that would have the United States Postal Service as a prospective tenant. *Id.* at 1005. Landmark West! argued that the United States Postal Service's payment of $9.8 million for the facility, and the acceptance of a $15 million promissory note in exchange for its leasehold interest another facility, constituted "federal funding" within the meaning of cases holding that such funding federalized the entire project for NEPA purposes. *Id.* at 1006. In rejecting the plaintiff's argument the court noted that the size of the overall project was more than $250 million and USPS's financial participation was incidental to the project. *Id.* In doing so, the court explained that "considering whether federal funding federalizes an entire project, courts have considered the degree to which the funding was essential to the project." *Id.* With this in mind, as noted above, without GSA participation in this project, the Administrative Record indicates that this project would not happen. (*See supra* p. 924).

■ But, perhaps more applicable to this case, *Landmark West!* explained that "in cases in which 'federal funding' has subjected a project to NEPA, the funding has been active, as opposed to the passive deferral of a payment, and programmatic, in the sense of being provided primarily to directly further a policy goal of the funding agency." *Id.* at 1007 *citing examples San Francisco Tomorrow v. Romney,* 472 F.2d 1021, 1022 (9th Cir.1973) (urban renewal loans and grants); *Named Individual Members of San Antonio Conservation Soc'y v. Texas Highway Dep't,* 446 F.2d 1013 (5th Cir.1971), *cert. denied,* 406 U.S. 933, 92 S.Ct. 1775, 32 L.Ed.2d 136 (1972) (federal highway aid). Here, the Administrative Record establishes, and even GSA concedes, that the purpose of the contract was to further its renewable energy usage goal—and creating "new" renewable energy resources. (*See* AR 1759, "In order to facilitate *new renewable resource construction,* contracts will need to be 10 years in length and the contracts will contain a 10 year option period." (Emphasis added); *see also* AR 1760, noting that "[S]ince the renewable energy is tied to a specific new project that will be developed, the start date is somewhat flexible to accommodate the vagaries of the construction process."). GSA's 10-year commitment to purchase a significant amount of the electricity produced by the proposed windfarm is undoubtedly the active use of federal funds that results in the proposed action being viewed as a major Federal action. *See Ely v. Velde (Ely II),* 497 F.2d 252 (4th Cir.1974) (LEAA grant to nonfederal entity to build local prison subject to NEPA and NHPA); *Proetta v. Dent,* 484 F.2d 1146 (2d Cir.1973) (plant expansion by private corporation financed with federal loans is subject to NEPA).

The Court does agree with the Defendants that the Administrative Record reflects that GSA's influence or control of the design and construction of the project

is limited as it relates to the actual operation of the wind turbines. However, it should also be noted that certainly the general geographical location and the type of structure is dictated by the terms of the solicitation (e.g. PJM Interconnection requirement and wind facility). (*See* AR 790–91; *see also* AR 1758, "The subject solicitation is for new renewable energy to be located in the PJM grid for General Services Administration.").

The Court has also considered the guidance provided in other cases cited by the Defendants. *Ctr. for Biological Diversity v. U.S. Dep't of Hous. & Urban Dev.*, 541 F.Supp.2d 1091, 1100 (D.Ariz.2008) *aff'd*, 359 Fed.Appx. 781 (9th Cir.2009) (finding no major Federal action in a case where the federal agencies were involved with guaranteeing loans for individuals and small businesses, yet after the financial assistance by a third party vendor was approved the Federal agencies' involvement ceased.); *Sugarloaf Citizens Ass'n v. F.E.R.C.*, 959 F.2d 508, 514 (4th Cir.1992) (finding no major Federal action in a case where FERC only regulated the rates paid by utilities to the qualifying facility and did not control the financing, construction or operation of the project."): In the end, GSA's involvement in the project raises the obligation to consider the environmental impact of its actions. The Court is convinced NEPA requires such consideration.

This Court wants to make abundantly clear that the record does not demonstrate that this Walnut Ridge Windfarm has become an irrevocably federal project. The project, of course, could go forwarded without reliance on the Renewable Energy Contract with GSA. But to the extent the contract remains in place, GSA must adhere to its obligation under NEPA. In that regard, this case is remanded to GSA to further consider whether the decision to enter the Renewable Energy Contract at issue in this case qualifies as a categorical exclusion under GSA regulations and guidelines (and whether any additional action based on that determination is required) and, in the event a categorical exclusion is not found applicable, to determine what additional environmental analysis is required by NEPA. Within 120 days of entry of an order, or within such further time as GSA may reasonably request, GSA will complete the remand process and submit a notice of its completion to the court.

## CONCLUSION

For reasons stated herein, Court's finds that GSA's determination that the proposed purchase of wind-produced electric energy and accompanying renewable energy certificates from MG2 Tribal Energy qualified as an automatic categorical exclusion pursuant to Section 5.3(r) of the Public Building Service National Environmental Policy Desk Guide was arbitrary, capricious or otherwise not in accordance with the law. This case is remanded back to GSA for further consideration consistent with this Order. This case is now closed.